### LORD & BURNHAM CO. v. PAYNE. .

(Circuit Court, D. New Jersey. July 10, 1911.)

1. PATENTS (§ 328*)—INVENTION—EAVE FOR GREENHOUSE.
　　The Burnham patent, No. 583,247, for a metal eave, specially designed for greenhouses, covers a device which in view of the prior art was the product of mechanical skill only, and is void for lack of invention.

2. PATENTS (§ 17*)—"INVENTION"—NATURE OF PATENTABLE INVENTION.
　　Every result obtained by deliberate reflection and experimentation with, well-known appliances or parts thereof is not necessarily "invention" within the meaning of the patent laws, even if it produces a superior benefit or effects a complete change in the means theretofore used.

　　[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 16, 17; Dec. Dig. § 17.*
　　For other definitions, see Words and Phrases, vol. 4, pp. 3749–3754.]

3. PATENTS (§ 17*)—"INVENTION"—NATURE OF PATENTABLE INVENTION.
　　"Invention" is not the offspring of mere mechanical skill, no matter how highly developed it may be; and, while it may be said to be the product of the intellect as against mere handiness in the use of tools, it is not every new mental conception in a useful art which marks an advance in such art that will raise the mechanic into an inventor under the patent laws.

　　[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 16, 17; Dec. Dig. § 17.*]

**4. PATENTS (§§ 37, 46\*)—INVENTION—NOVELTY AND UTILITY.**

Novelty and utility are influential factors in determining invention when the mind is otherwise in doubt, but the resort to novelty and utility, however, is not to be made to create a doubt.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 41-44, 54, 55; Dec. Dig. §§ .37, 46.\*

Utility, extent of use and commercial success as evidence of invention, see note to Doig v. Morgan Mach. Co., 59 C. C. A. 620.]

In Equity. Suit by the Lord & Burnham Company against John A. Payne for infringement of letters patent No. 583,247, granted May 25, 1897, to William A. Burnham for improvements in metal eaves. On final hearing. Decree for defendant.

Macdonald & Macdonald, for complainant.

Edward C. Davidson, for defendant.

RELLSTAB, District Judge. The complainant, by mesne assignments, is the owner of the letters patent. The patentee was a designer and builder of greenhouses. The main problem sought to be solved by the patented device was to prevent the accumulation of ice and snow at the eaves, which at times would cause the ice to creep up the glazed roofs and to overhang the side walls in the form of icicles. Such accumulations of ice were detrimental to the plants, because they shaded and had a refrigerating effect upon the interior.

In describing the invention, the patentee states:

"My invention relates to an improved construction of eave adapted more especially for use on horticultural buildings, though it may be used on all classes of buildings, where such a construction is found advantageous; and my objects are to produce a simple and effective construction and to avoid the use of wood plates and gutters at that part of the structure which during the winter allow snow and ice to accumulate in or on them and thus prevents the perfect drain from the glass and the obtaining of an even temperature and sufficient light in the building.

"I accomplish the above objects by the use of an overhung metal piece which is placed between the side wall and the roof and so arranged that a portion of the metal is within the building so that it is affected by the temperature thereof. The heat of this part is conducted to the other part, which is outside of the building, so that it becomes heated and thus prevents any formation of icicles and the accumulation of snow.

"A further object of my invention is to provide a simple and effective construction for securing the several parts in a horticultural building at the junction of a rafter and the side wall, to serve as a means to carry the roof between rafters with the least possible obstruction of light."

The charge of infringement is limited to claim 1, which is as follows:

"A metal eave consisting of an angle iron, located between the side wall and the roof, and adapted to serve as a support for the edge of the roof and to have the side wall secured thereto, and said angle-iron arranged to have one member in substantially the same plane as the plane of the roof with the remainder thereof in the interior of the building so as to be affected by the temperature therein, substantially as shown and described."

[1] The prior art shows two general types of greenhouse—gutter and nongutter types—the former made of both wood and metal; the latter of wood only. Complainant's and defendant's are of the non-

gutter type. Both types were troubled with the accumulation of snow and ice at, above, and below the eaves, obstructing the sunlight and refrigerating the interior, with damaging effect upon the inclosed plants. Such accumulation of ice was not due alone to the freezing of the waters produced by the melting of snow, but also of the waters produced by the condensation, due to the difference of temperature between the inner and outer sides of the glass roof, and which would pass through the laps of the panes of glass and flow down the roof till it reached the eave or gutter, where it, because of the lower temperature there prevailing, would freeze, obstructing the further flow and contributing to the further accumulation and backing up of ice on the roof and the forming of large icicles hanging over the eaves or gutter, resulting in added darkening and refrigeration within. Such accumulation of ice and snow, because of the weight or pressure resulting therefrom, caused the frequent breakage of the panes of glass at the eaves. The wood structures—eave or gutter—lasted but a short time, the natural decay being accelerated by their frequent saturation with the water resulting from the condensation referred to. The gutter type—wood or metal—by reason of its more bulky construction produced more shade than the eave plates, with retarding and frequent injurious effect upon the growth and bloom of the plants. To prevent such effects was, as already stated, the problem confronting the commercial grower of horticultural products. This prevention, complainant claims, was intended and accomplished by his patented contrivance.

The invention claimed has but one element—a metal eave. It is in form an angle-iron. It is located between the roof and the side walls, extending the entire length of the building. It is adapted to support the edge of the roof and to have the side walls secured thereto. It is so arranged that one of its members projects outwardly in the plane of the roof, overhanging the side wall. The remaining member extends inwardly, is exposed to the heat of the building's interior, and conveys or conducts it outwardly to and through its outer member. The patentee does not limit the term "angle-iron" to its ordinary definition; but in defining it says:

"It will be understood that by use of the term 'angle-iron' I mean to include not only the bar which in cross-section forms two sides of a triangle, but all of the other shapes, such as I and T iron, channel iron, &c."

The drawings, so far as applicable to claim 1, show an angle-iron with an inward member extending downward at right angles to the outer member. Two new and useful purposes are said to be served by this device: First, it secures by a simple and effective contrivance the roof to the side walls of the greenhouse, with but little obstruction to light; second, it prevents the accumulation of snow and ice on the roof and from overhanging the side walls, thus avoiding additional obstruction to light from without and a resultant reduction of temperature within.

The defendant's structure alleged to be an infringement is made up of two angle-iron bars, riveted together in reverse positions. One of these is entirely within the building; the other, like complainant's device, is located between the roof and side wall, serving as an eave

plate and support for the edge of the roof and to which the side walls may be secured. It has one of its members or plates projecting outwardly in the plane of the roof, and overhanging the side wall; the other member, like complainant's device, extending inward and downward, receiving the heat from the interior of the building, and transmitting it outwardly through its other member. It is to this inward-extending member that the other angle-iron is riveted, the two overlapping and forming a drawn out "z":

While one or more of the uses made of the inner angle-iron of the defendant is different from that of the complainant, yet it, in coaction with the other angle-iron which extends to the outside of the building, performs the same function, viz., transmission of heat through the inner member to the outer and projecting member, as the angle-iron of the complainant. The defenses are noninfringement, anticipation, and mechanical suggestion. If complainant's device shows invention, the defendant's device is a clear infringement. Complainant's device practically superseded the former structures with the commercial grower, as it greatly minimized the accumulation of snow and ice at the places mentioned, and the resultant damage to the glazed roof and the plants within the building, and because it was more durable and cast considerably less shade into the interior of the greenhouse.

A number of patents have been cited as anticipations. No one of them is a complete disclosure of the idea of means embodying the complainant's device. Their teachings, however, plus the matter resting in public knowledge and use, negative invention in complainant's device. Burnham was thoroughly conversant with the then developed greenhouse art, as well as the detriment resulting from the continued presence of snow and ice at the eaves, and the benefit to be derived in preventing or minimizing the shading and refrigerating due thereto. He had previously secured patents Nos. 535,049 and 535,091, dated March 5, 1895, involving the gutter type construction in such art. That wood was a nonconductor of heat was well known, and Gibbons in his patent, No. 471,356, dated March 22, 1892, using the metal gutter, taught the art, if it needed teaching, that the heat from the interior of the greenhouse could be conducted to the outside, and utilized to prevent or lessen such accumulations—the very purpose contemplated by the patent in suit. That Gibbons had this purpose in mind is manifested by his specifications, wherein he said (page 1, lines 9-13):

"The object of my invention is to provide an arrangement of the roof and side walls of a building so that I may expose a portion of the eaves gutter to the heat from the interior, as will hereinafter be more fully described."

And at lines 65-69:

"It will thus be seen that there is a portion $e^3$ which is exposed to the heat from the interior, thereby preventing the water from freezing in the gutter and clogging the same."

Gibbons' device, though it tended to loosen up the ice in the gutter and cause it to melt, did not achieve a quick disposal of the water that flowed into the gutter. This gutter being separated from the glazed roof by a wood strip, the heat from the interior would have no prevent-

ative effect on the accumulation of the ice and snow at the edges of the roof, with the result that ice and snow did accumulate at that part of the roof and had a tendency to creep thereup and to run over the gutter overhanging the side walls. This construction, because of its bulkiness at the junction of the roof and walls, created as much, if not more, shade than the wood eave structure, and also contributed to the breakage of glass, for the same reasons applicable to the earlier structures. The Burnham gutter constructions were not only exposed to the interior heat, but dispensed with the strip of wood between the roof and gutter by employing an angle-iron interposed between the side walls and roof, thus avoiding the resultant damages due to such a nonconductor being located at such junction; yet it afforded no speedy shedding of the waters, and did not prevent or greatly lessen the accumulation of ice and snow in such gutters. The bulky construction of such gutter structures created as much, if not more, shade as their eave plate predecessors, and neither they nor the Gibbons' device entirely displaced such type with the commercial grower. What was needed was to dispense with such gutters and permit of a quick disposal of the waters from the eave. These gutter constructions, however, taught how to take advantage of and transmit the interior heat to the outside of the greenhouse. In this respect they anticipate the claim of the patent in suit, which refers to the inner member of the angle-iron broadly as in the interior of the building, so as to be affected by the temperature therein. True, the precise form and location of the angle-iron of the patent in suit is not carried out either within or without the building, but the constructions are capable of performing and do perform the function of appropriating the heat from within and transmitting it outward.

The patent in suit has no gutter. The metal eave, however, was not new. The prior art, as illustrated by the Snead patent, No. 112,644, dated March 14, 1871, disclosed it. Snead's eave construction shows, in the language of complainant's claim, "one member in substantially the same plane as the plane of the roof with the remainder thereof in the interior of the building so as to be affected by the temperature therein." The inner member of the Snead construction extends first downward practically at right angles to the outer member; then, second, curves upward forming a gutter. Adopting the language of the defendant's expert, Abbott:

"It is located between the side wall and the roof precisely as the claim requires. It is not only adapted to serve as a support for the edge of the roof, but as a matter of fact does so support it. It has itself, of course, to be supported, the same as the angle-iron of the patent; but the claim makes no requirement in this respect. It may be supported in any preferred way, depending upon the preferences of the constructor or the special kind of building in which this metal eave is used. * * * The side wall is not only adapted to be secured to the angle-iron of Snead, but as a matter of fact is so secured. * * *"

The angle-iron of Snead has one member arranged not only substantially in the plane of the roof, but exactly in that plane, and the glass rests upon it, precisely as in the patent in suit; and the remainder of Snead's angle-iron—that is to say, the other member or

plate thereof—is within the interior of the building, and is affected by the temperature therein, and does transmit it to the part which is outside the building. The Snead patent is an improvement in skylights—glazed roof—a part of the same art as greenhouses, and was so considered in the Patent Office. The patentee makes no reference to the inner member's exposure to the interior heat of the building, but it is so exposed, and it will perform the function of taking and transmitting outward the interior heat just as ascribed to the angle-iron of the patent in suit.

Wood, in his patent No. 293,696, dated February 19, 1884, improvement in greenhouses, shows an angle-iron in shape and disposition of its members substantially identical with that of the patent in suit. Perhaps it does not extend along the entire length of the greenhouse, but, short or long, it is interposed between the side wall and the roof, supports the edge of the roof, and straddles the side wall, which is beveled to permit of a snug fit. With the disclosure of the Burnham gutter patents of the eave plate 4 running longitudinally under the edge of the roof, and exposed to the interior heat the whole length of the building, it would be but a mechanical act to lengthen the angle-iron disclosed by the Wood patent (if it needed lengthening) and to extend both members thereof so that the inner one would take and conduct heat from the interior and through the other member to the outside of the building, and that the outer member could shed the water away from the side walls.

Burnham's gutter constructions, a part of the prior art as already stated, eliminate the nonconducting glazed plate at the edge of the roof, substituting therefor a part of its gutter construction, which at such edge is in form of an angle-iron, and which by being interposed between the side wall and the roof supports the edge of such roof. This angle iron at the edge of the glazed roof serves as an eave plate, and, having a large exposure to the inner heat, is capable of transmitting it outward and applying it at the place where, in my judgment, it will be the most effective in preventing the waters flowing down the roof from freezing, thus preventing the accumulation of ice at the very place where, in the prior structures, such ice was bound to accumulate, and from which horticulturalists experienced the greatest damage to the plants.

With these disclosures of the prior art, was the idea of means embodied in the patent in suit, by which the patentee's object was achieved, the result of anything more than mechanical suggestion? The outer member of the complainant's angle-iron—his eave plate—which shed the waters from the roof, possessed nothing new in form or material. In form it was but the counterpart of the wood eave long used in the construction of greenhouses. And Snead and Wood show it in iron. But, if it had not been shown in iron in a prior patent, the using iron in place of wood would not be invention. Iron as a conductor, and wood as a nonconductor, of heat, were well known, and such substitution would be readily suggested to one who knew the detrimental results of the using of wood at the junction of the roof and wall, and the beneficial results derived from the use of iron in transmitting the heat from

within outward, as shown by the prior devices. The use of angle-iron located between the side wall and roof adapted to support the edge of the roof and to have the side wall secured thereto, arranged as to have one member substantially in the same plane as the roof, and the other member extending inwardly substantially at right angles to the other member, and the conducting of heat by the use of iron from within outward for the purpose of preventing the formation of ice, being old in the art, nothing more was required than that quality of mental operation that occurs to the ordinarily skilled mechanic made acquainted with the problem to be solved and the state of the art bearing upon that problem, to produce by experiment an extension and readjustment of such members of the angle-iron within and without—within to present a greater exposure to the heat, without to produce a shed beyond the side walls, so as to produce the equivalent of the device in suit.

[2] It is said that an additional object obtained by complainant's device is a simple and effective construction at the junction of the rafters and side walls with a minimum obstruction of light. But this is but incidental, and does not make the structure any less the product of mechanical skill as distinguished from invention. Every result obtained by deliberate reflection and experimentation, with well-known applicances, or parts thereof, is not necessarily invention within the meaning of our patent laws. They are not necessarily such even if they produce a superior benefit or effect a complete change in the means theretofore used in obtaining the same or a better result. Judge Phillips, in Tiemann v. Kraatz, 85 Fed. 439, 29 C. C. A. 257, in applying Atlantic Works v. Brady, 107 U. S. 199, 2 Sup. Ct. 225, 27 L. Ed. 438, used language so apt to the question now being considered that a verbatim quotation is justified:

"In this day of increasing demand for new and enlarged mechanical appliances, the first natural result is the production of a large class of skilled and experienced mechanics and artisans, and, second, a more studious and constant development in applied mechanics. And, as such advance plainly points out to the attentive and assiduous workman the natural, larger, practical adaptation of existing known mechanical devices, to invest each one of these developments with the immunity of a monopolizing patent would not only be a perversion of the term 'invention,' but would utterly extinguish the doctrine of mechanical equivalents."

[3] Invention is not the offspring of mere mechanical skill, no matter how highly developed it may be. And, while it may be said to be the product of the intellect as against mere handiness in the use of tools, it is not every new mental conception in a useful art, which marks an advance in such art, that steps the mechanic into an inventor under our law. I cannot subscribe to the doctrine that mechanical skill does not require thought or that thinking out a mechanical problem to a satisfactory solution necessarily involves the exercise of the inventive faculty. A skilled mechanic can produce devices that are new and useful, but under the patent laws, unless they are also inventions, they are not patentable. Neither the constitutional provision nor the patent statute is intended to give a monopoly for a mere mechanical device, no matter how novel or useful it may be. It must be inventively

new and useful. To be entitled to a monopoly, the patentee must show that his device is the mechanical embodiment of a new mental conception, the result of mental explorations, which carries him beyond the boundary lines of the field or scope of ordinary mechanical or engineering skill.

[4] This boundary, of course, is hard of demarcation, and, because it is so, novelty and utility are influential factors in determining invention, when the mind, seeking a pronouncement by applying the ordinary tests, is in doubt. The resort to novelty and utility, however, is not to be made to create a doubt. Such qualities cannot serve as both creator and solver of doubt. It is only when the mind is in doubt upon the consideration of the evidence affecting the question of invention as against mechanical suggestion, without regard to the thing being new and useful, that such latter qualities are available to throw the balance in favor of invention. Invention being put in doubt in the manner stated, then evidence that such a device was long sought for, that the problem had attracted many, and that others than the patentee had made barren efforts to secure a solution, and that upon the appearance of the patented device it promptly displaced other structures, will usually justify the finding of invention. But neither the ordinary tests of exclusion nor of utility and novelty are conclusive. Presumably every patent presents a new creation, and each record a distinct problem. All tests are but guideposts—means to an end—and the end is never to be sacrificed to the means. The purpose of the patent law is not to promote every advance in the mechanical arts into invention. To reward every such achievement with a monopoly would be to exact tribute from the general public where none is due, to dampen, if it did not stifle, what would otherwise be a steady advance in mechanics, and hamper rather than stimulate the very progress of the useful arts intended to be promoted by the patent laws.

After giving this subject the best thought of which I am capable, and more time than is perhaps justifiable, considering the other cases pressing for decision, I am constrained to the conclusion that, in spite of the apparent novelty and utility of the complainant's device, it, in view of the prior art, is the product of mechanical skill, and not invention.

The bill is therefore dismissed, with costs.