## NEW JERSEY ZINC CO. v. AMERICAN ZINC, LEAD & SMELTING CO.
### et al.

(District Court, D. Maine.   November 30, 1921.)

No. 804.

**1. Patents ⇐⇒18—Simplicity of device is not argument against invention.**

The simplicity of the device covered by the patent is not an argument against invention.

**2. Patents ⇐⇒16—No exact test to determine invention.**

No test has been formulated by which a satisfactory line can be drawn between the products of the inventor's intuition and the results of the mechanic's skill, but that question must always be left to a careful exercise of the judgment, guided by the established rules of law.

**3. Patents ⇐⇒328—931,815, for improved ore-roasting furnace, held not to disclose invention.**

The Tucker patent, No. 931,815, for improvements in an ore-roasting furnace which consisted only in lengthening the handles of the controls for certain machinery so that they all could be operated by one man instead of requiring two as theretofore, *held* not to disclose invention and to be invalid.

**4. Patents ⇐⇒36—Advance and improvement in art not invention in themselves.**

Substantial advance and marked improvement which are progressive steps in an art, however beneficial, are *not in themselves* evidence of invention.

In Equity.  Suit by the New Jersey Zinc Company against the American Zinc, Lead & Smelting Company and another.  Decree directed dismissing the bill.

Pennie, Davis, Marvin & Edmonds, of New York City, and Woodman & Whitehouse, of Portland, Me., for plaintiff.

Coolidge & Hight and Emery, Booth, Janney & Varney, all of Boston, Mass., for defendants.

HALE, District Judge.  This suit in equity involves the construction of United States patent No. 931,815, August 24, 1909.  The first question to be considered is the validity of the patent.

The art to which it relates is that of roasting zinc sulphide ores for the manufacture of metallic zinc, or slab zinc, and commercial zinc oxide.  The native oxidized ores are available for subsequent smelting operations for the production of slab zinc.  The sulphide ores, on the other hand, must be freed of sulphur before they are available for subsequent smelting operations.  To effect this the roasting operation is necessary and is conducted in a furnace wherein the ore is heated, in the presence of air, to a red heat, at which temperature the sulphur has a greater affinity for the oxygen of the air and unites with it to form sulphur dioxide gas.

It is claimed that the invention was made by Allen Tucker of Mineral Point, Wis.  It involves certain improvements relating to an ore-

⇐⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

roasting furnace generally known as the Hegeler furnace, invented by one Edward C. Hegeler—United States patent No. 303,571, August 12, 1884.

I follow substantially the plaintiff's description of the Hegeler furnace: This Hegeler furnace comprises a central brick structure about 80 feet in length, about 25 feet in height, and about 18 feet in width, divided longitudinally into two parts by a central vertical wall, on each side of which there is built a tier of superposed ovens or hearths, each hearth being about 6 feet in width and about 1½ feet in height. Beneath each of the three lower hearths is a gas flue through which hot gases are passed to assist in maintaining the ore at the necessary temperature during the last stages of the roasting operation.

At each end of the furnace proper is a structural framework about 80 feet in length, generally called the rod alley and upon which is mounted appropriate machinery for mechanically drawing rakes through the ore during its roasting and thereby stirring the ore and progressively moving the ore along the hearths. In the furnaces considered in this suit, this machinery comprises (for each hearth) a pair of sprocket wheels, mounted at opposite ends of the structural framework, carrying an endless chain to which is secured an iron rod or bar about 100 feet in length and about 1½ inches in diameter for the support of which appropriate guide pulleys are provided. By means of sliding gears or clutches, one of the sprocket wheels of each chain may at will be connected to a main shaft driven by a reversible electric motor provided with a controller by means of which its direction of rotation can be determined and its speed regulated. The sliding gears or clutches and the controller, with such means as cables, chains, extensions, etc., as are required to effect manipulation at a distance of these instrumentalities, constitute the control devices or control mechanism for the rake moving machinery. A turntable is arranged at each end of the brick structure, between that structure and the adjacent end of the structural framework for the rake moving machinery—frequently called the rake reciprocating mechanism. Each turntable has seven superposed shelves corresponding in height with the seven hearths of the furnace; its function is to support the rakes during their idle periods and, by rotation through 180 degrees, to transfer the rakes as withdrawn from one tier of hearths into position for appropriately entering the other tier of hearths.

The ore to be roasted is periodically charged in appropriate amount into one end of the top hearth of one tier where it is stirred, and an appropriate amount worked towards the opposite end of the hearth, by means of a mechanically drawn rake. From the top hearth, an appropriate amount of ore drops through a slot or "drop hole" in that hearth. upon the hearth below; the ore on the latter hearth is then stirred and an appropriate amount worked towards the other end of that hearth and dropped through a slot therein upon the hearth below; and so on until the roasted ore is finally discharged from the bottom hearth. Since the hearths are generally about 80 feet in length, the ore travels a total distance of about 560 feet in passing through the seven hearths of each tier of the furnace. Each hearth is at all times covered with

a layer of ore and there is usually from 150 to 200 tons of ore in the furnace at all times.

The ore is progressively moved forward on the hearths by rakes which are pulled through the hearths by the rake moving machinery— rake reciprocating mechanism—located at each end of the furnace. The rakes are large iron structures weighing some 1,200 to 1,500 pounds each. The plaintiff says that, prior to the invention of the Tucker patent in suit, two men were required at each end of the furnace for the raking operation. One man, called the "machine man" or "floor man," concentrated his attention wholly upon the operation of the mechanism or machinery for mechanically moving the rakes. Everything that had movement or which controlled selection or direction was in the hands of that man. His operating station was on the ground or floor adjacent to the head frame of the rake reciprocating mechanism, and here he manipulated the control devices. The other man, called the "hooker" or "platform man," attended to the hooking and unhooking of the rakes and the guiding of the rods and rakes into the hearths. Since his operating station was at various heights or levels, appropriate platforms were provided at each end of the furnace, and on each side thereof, upon which the hooker stood in the performance of his duties. This prior art arrangement is referred to as the "two men control," by which is meant two men at each end, or four men for the furnace. The plaintiff says that the patent in suit involves an improvement in the arrangement of the control devices for the rake moving machinery, and that such improvements aim to accomplish two things: (1) Easy and immediate control of the rake moving machinery with consequent improved operation, and (2) economy in labor required.

The Tucker patent states at the outset:

"This invention relates to furnaces in which a rake is reciprocated for the purpose of stirring the contents of the furnace, and is particularly applicable to that class of furnaces in which ore is roasted, such as zinc and other ores. The invention resides in mechanism for operating the rakes of such furnaces so that the movement of the same will always be under easy and immediate control, and whereby the number of men necessary to operate such furnaces is reduced."

Only claims 1 and 2 are involved in this inquiry. They are as follows:

"1. The combination with a furnace having a plurality of tiers of ovens, a pivoted transfer table located at each end of the furnace and adapted to move into position opposite the end of each tier, and having shelves located on a level with each oven, operators' platforms located adjacent said transfer tables at the end of each tier of ovens, a series of rakes adapted to pass through both tiers of ovens, mechanism for reciprocating said rakes, and controlling mechanism for said reciprocating mechanism having their ends located at said operators' platforms.

"2. The combination with a furnace having two tiers of ovens, a turntable located at each end of the furnace, and pivoted centrally between the tiers so as to move into position opposite the end of each tier, shelves carried by said turntable on a level with each oven, operators' platforms located at each side of said turntable adjacent the ends of each tier of ovens, a series of rakes adapted to pass through both tiers of ovens, mechanism for reciprocating said rakes, controlling means for starting and stopping said mechanism, means for

controlling the direction of motion thereof, said controlling means having ends terminating at said operators' platforms."

It is said by the plaintiff that the gist of the alleged invention is found in the last clause of claim 1:

"Controlling mechanism for said reciprocating mechanism having their ends located at the operators' platforms."

An expert introduced by the plaintiff says that the invention had two general uses; the securing of an easy and immediate control for improved operation and the reduction in labor force. He claims that the patentee effected this result by such a rearrangement of parts as concentrates in the hands of the hooker the duties of two men, and makes the actual labor less than the sum of the two men's labors; and that, in order to carry out this conception, he places, at the proper point, at different levels, the motor control handles which this one man may always find convenient for his use.

Plaintiff says that Tucker thus decentralized the control connections in the hands of the floor man and carried them to the seven platform positions which the hooker successively occupied during the raking process.

Did Allen Tucker make a patentable invention when he ran the control lines to the platforms instead of running them to the floor?

There is some testimony that when the Hegeler patent of 1884 had expired the Illinois Zinc Company built furnaces of the Hegeler type, using the two tiers of hearths, the pivoted transfer tables, the rake and rake rods as used by Hegeler; but using chains, for reciprocating the rods, instead of the rolls used by Hegeler, and stationary platforms for the hookers to stand on; and that more than two years prior to the filing of the application for the patent the plaintiff was using at Mineral Point, Wis., a furnace provided with the above mechanism. But the defendant claims that there was one important difference; that the friction clutches or shifting belts for determining the direction of movement of the rake rods were done away with and a reversing electric motor was substituted; and that this motor was not the invention of Tucker.

It is urged by the plaintiff that the Tucker invention aims, not only to reduce the force of men necessary to operate the furnace, but to greatly improve the operation of the furnace. The testimony fails to convince me of any great improvement in the operation of the furnace effected by Tucker's contribution to the art. I am of the opinion that the only substantial thing which he contributed, or sought to contribute, to the art was the convenience and economy obtained by reducing the number of men necessary to operate the kiln. There is some testimony tending to show that the possibility of the platform control had been considered years prior to Tucker; but had been discarded as then mechanically of no advantage; but that later it was found that, after the great war had produced a shortage of men and increase of wages, the saving of platform men became of sufficient consequence to justify its adoption by plaintiff and by the defendant.

[1] The contribution of Tucker did not involve any great change in machinery. It passed the lines from the floor man to the several platforms where the hooker could operate them. The simplicity of the device is not of course an argument against it. About all that can be said effectually on this subject is said in Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177. When a thing has succeeded, it is very likely to seem plain to anyone. The wonderfully useful result, obtained in that case, of making a loom produce 50 yards a day when it had never before produced more than 40, was evidently the controlling matter in the mind of the court.

My attention has been called to a classic on this subject by William Phillips in his treatise on patents:

"The very simplicity of an invention, which leads the inexperienced to infer little merit or application in the inventor, is most commonly the sequel of complications, which in succession have been contrived by him, and in succession been rejected. Indeed, who that ever cast a glance of intelligent observation upon our manufactures, or that has ever been struck with the combined simplicity and efficacy of the means employed, can do otherwise than infer that any one of the means that he admires must have been selected for superiority, when perhaps a thousand others have been rejected?"

[2] Most of the cases brought to my attention by the learned counsel for the plaintiff are cases wherein certain parts of a machine were changed in location, thus producing an improved automatic action of the machine, and where the human element in the conduct of the machine was not present. The learned counsel for the plaintiff has, however, brought to my attention some late cases which are very close and very suggestive upon the point at issue. In Burdett Rowntree Mfg. Co. v. Standard Plunger Elevator Co. (C. C.) 196 Fed. 43, the invention related to the one point control of electric elevators. The patent offered a system in which every movement of the car was controlled by one person only and at one place only, namely, by the motor attendant and at the motor itself. The court found that the only question in the case was whether the patented device was a true combination or a mere aggregation of elements. Every element was old. The question was whether the combination produced a new and useful result. The court drew the line between a combination and an aggregation and concluded that the case came within the "twilight zone"; but the balance of the judgment of the court was in favor of the patent. The court found that the patent did not do much more than "move signals from one place to another without changing their function." But the court found, that, in making this change, each part had been made more effective to accomplish the common object, and that the increased efficiency was due to the new relation of each part to the others.

My attention is also called to Kinloch Tel. Co. v. Western Electric Co., 113 Fed. 659, 51 C. C. A. 369, in which case the patent discloses an improvement in arrangement of enunciators and the line jacks and answering jacks of a multiple switch board telephone system. The essence of the invention was found to be the convenient and uniform grouping of the enunciators and their corresponding answering jacks

276 F.—47

relatively to each other. Utility was not denied; but it was said that it was not patentable because any mechanic skilled in the art could have produced it without any creative genius.

In Star Brass Works Co. v. General Electric Co., 111 Fed. 398, 49 C. C. A. 409, the court rested its result upon the Loom Company Case. It found that the safety and efficiency of the machine had been greatly enhanced and that the profits resulting from its operation had been greatly increased.

See, also, National Hollow Brake Beam Co. v. Interchangeable Brake Beam Co., 106 Fed. 693, 45 C. C. A. 544; Smith v. Vulcanite Co., 93 U. S. 486, 495, 23 L. Ed. 952; Keystone Manufacturing Co. v. Adams, 151 U. S. 139, 14 Sup. Ct. 295, 38 L. Ed. 103; Topliff v. Topliff, 145 U. S. 156, 164, 12 Sup. Ct. 825, 36 L. Ed. 658. No court has ever been able to formulate a test by which a satisfactory line can be drawn between the products of the inventor's intuition and the results of the mechanic's skill. That question must always be left for determination to a careful exercise of the judgment, guided by the established rules of law. There is often great difficulty in determining whether a case is within the reasoning of Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177, or of Atlantic Works v. Brady, 107 U. S. 200, 2 Sup. Ct. 225, 27 L. Ed. 438.

[3] In the case before me the electric controllers and the clutch-throwing instrumentalities were placed in different locations from those of the prior art; so that they could be conveniently operated by the hooker-man on the platforms instead of by the machine operators on the ground. No new organization was made; no substantial change in the machinery was effected; the instrumentalities included in the claims in suit are in nature and function precisely what they were before; they are arranged in the same combination. The lengths of the controls are changed; but the new length gave them no new use. It is difficult to see how a new and useful result was obtained by the change. I cannot find that the controls were made more effective to accomplish the common object; nor that there was any new relation of each part to the others which gave a new and useful result, or that the total efficiency was greatly improved, as it was in the Burdett Rowntree Case. Nor can I find that glaring evils were removed and greatly increased operative power provided, as in the Kinloch Telephone Co. Case. It is not shown that the product was greatly enlarged and that thus the commercial value of the machine was greatly enhanced. While the case was on trial I pointed to the window shade cord at the side of the courtroom, ordinarily managed by the court officer, and asked whether it would be invention to change the length of the cord, so that it might be extended to the court's desk, and thus enable the court to manage the cord. I cannot now see that there was a much greater use of the inventive faculty in the patent at bar than in the instance which I thus casually noted.

In Hillard v. Remington Typewriter Co., 186 Fed. 334, 108 C. C. A. 534, decided in the Second Circuit, in speaking for the court, Judge Coxe said:

"Mechanical skill is not converted into invention because it is applied to a structure showing the highest degree of inventive genius. If the problem be to construct a key for a lock, it can make no difference whether the lock be attached to a typewriter or an ice box.   *   *   *

"The problem is one which is continually presented where it is desirable to bring an operating part nearer to the hand of the operator. Similar expedients have been constantly resorted to. If a door be closed by a spring lock operated from the inside and the inmate of the room desires to open it to a visitor without rising from his desk, he naturally rigs up a connection by cords and pulleys and releases the lock by pulling on the cords. If it be desired to open or close a transom or a window which cannot be reached by hand, nothing is more common than the resort to pulleys and cords, cranks and levers. Such methods have been in vogue for years. The patentee conceived the idea that it would be more convenient to have the operating key located where it could be seen and reached by the operator while seated, and he therefore placed it in the keyboard connecting it by a well-known train of mechanism with the line-lock stop. It did not require an exercise of 'the intuitive faculty of the mind' to do this."

In prepayment Car Sales Co. v. Orange County Traction Co. (D. C.) 214 Fed. 402, the patent in suit was directed to a passenger car of the "pay as you enter" type, wherein the door controlling means was located at the most convenient place for a car of that type. The court pointed out that the location of the control handle is arrived at by considerations of convenience and that there was no patentable invention in the location of the door controlling means upon the platform in accordance with the mere convenience of the person who was to operate it; that, wherever located, its function is the same; and that a change in its location involves ordinary mechanical skill and not inventive faculty. The decision was affirmed on appeal. 214 Fed. 576, 131 C. C. A. 156.

See, also, Mann's Boudoir Car Co. v. Monarch Parlor Sleeping Car Co. (C. C.) 34 Fed. 130: Aron v. Manhattan Ry. Co., 132 U. S. 84, 10 Sup. Ct. 24, 33 L. Ed. 272. In the case cited, in speaking for the court, Mr. Justice Blatchford said:

"The patentee is entitled to the merit of being the first to conceive of the convenience and utility of a gate opening and closing mechanism which could be operated efficiently by an attendant in the new situation. His right to a patent, however, must rest upon the novelty of the means he contrives to carry his idea into practical application. It rarely happens that old instrumentalities are so perfectly adapted for a use for which they were not originally intended as not to require any alteration or modification. If these changes involve only the exercise of ordinary mechanical skill, they do not sanction the patent: and, in most of the adjudged cases where it has been held that the application of old devices to a new use was not patentable, there were changes of form, proportion, or organization of this character which were necessary to accommodate them to the new occasion. The present case falls within this category."

[4] The courts have often pointed out that substantial advance, marked improvement, progressive steps in an art, however beneficial, are not in themselves evidences of invention. As industry proceeds more engineering skill is developed, more mechanical progress is made, more skill of the mechanic is expected. Hansen v. Slick, 230 Fed. 627, 145 C. C. A. 37; Lord & Burnham Co. v. Payne (C. C.) 190 Fed. 172;

Sloan Filter Co. v. Portland Gold Mining Co., 139 Fed. 23, 71 C. C. A. 460; Grinnell Washing Machine Co. v. Johnson Co., 247 U. S. 432, 38 Sup. Ct. 547, 62 L. Ed. 1196; Richards v. Chase Elevator Co., 158 U. S. 299, 302, 15 Sup. Ct. 831, 39 L. Ed. 991; Voigtmann v. Weis & Ridge Cornice Co., 148 Fed. 848, 853, 78 C. C. A. 538.

In the case at bar, I think every instrumentality enumerated in the patent is shown by the proofs to be old and well known long prior to Tucker; and no single instrumentality enumerated in the patent has been endowed with any new use; each performance has the same function it had before. Tucker arranged his lines so that one man was required to do the hooking and to operate the controls, which were lengthened for that purpose; but no new instrumentalities are involved; no mechanically new use of an existing instrumentality is involved. It seems to be a combination of old elements and old results, with no new function, evolved from the combination. Each element performs some old and well-known function; the result is not a patentable combination, but an aggregation of elements as in Richards v. Chase Elevator Co., 158 U. S. 299, 302, 15 Sup. Ct. 831, 39 L. Ed. 991, cited supra.

The result is that the patent is found not to present a patentable invention, and is therefore invalid.

A decree may be presented, dismissing the bill, with costs.