## GERRARD et al. v. CARY et al.

(Circuit Court of Appeals, Second Circuit. June 16, 1925.)

No. 348.

Patents ⊱328—Patent No. 1,466,334, claims 1, 2, 3, 5, 6, covering machine for straightening, swaging, and cutting wire, held invalid for lack of invention.

Patent No. 1,466,334, claims 1, 2, 3, 5, 6, relating to machine for straightening, swaging, and cutting wire into predetermined lengths, *held* invalid for lack of invention.

Appeal from the District Court of the United States for the Eastern District of New York.

Suit by Alex J. Gerrard and others against Spencer C. Cary and another. Decree for defendants (9 F.[2d] 949), and plaintiffs appeal. Affirmed.

Darby & Darby, of New York City (Samuel E. Darby, of New York City, of counsel), for appellants.

Drury W. Cooper, of New York City, W. O. Belt, of Chicago, Ill., and H. I. Bernhard, of New York City, for appellees.

Before ROGERS, MANTON, and HAND, Circuit Judges.

MANTON, Circuit Judge. This suit was brought for infringement of patent No. 1,-466,334, granted August 28, 1923, on an application filed June 14, 1922. Claims 1, 2, 3, 5 and 6 are relied upon. The invention relates to a machine for straightening, swaging, and cutting wires into predetermined lengths, and has for its object to improve the construction of somewhat similar machines that have been theretofore used. The invention is said to consist in the novel details of a construction and combination of parts disclosed in the specifications and claims. The machine is used in the art of tying packages with wire. Baled ties and plain wire ties had been extensively used prior to the grant of the patent in suit. The appellants had been using wire and selling tools for applying such wire long prior to the invention. Between 1915 and 1918, a machine was used which twisted the wires together to secure the wire on the package. This and other machines used plain wire without the notch or flattened portion which is now impressed in the end of the wire by the machine constructed under the patent in suit. The machine known as the Wells, constructed under the Hoefer patent, which was issued in 1913 and which had expired prior to the appellants entering the field, had been

used. The invention is broadly to make a machine for straightening, swaging, or cutting wires, but it is an improvement in the construction of the Wells machine, and this is the extent of the claim of the appellants.

Claim 1 comprises in combination (1) a means to straighten the wire as it travels from the coil to the machine (as in the Wells machine of the Hoefer patent); (2) means to receive the lengths of wire as they are cut; (3) the power shaft; (4) a cam loose on the power shaft; (5) means to connect said means with said cam, being a clutch; (6) a lever arm actuated by said cam; (7) a swaging die on the lever; (8) a cooperating swaging die employed on the stationary anvil, and (9) a cutting die. Claim 2 provides for a pedestal having a face through which said wire is fed which is a frame *A* and a cutting die *K* of the Hoefer patent, and which moves over said pedestal face as the claim specifies. Claim 3 includes the wire-feeding means which are the wire-feeding rolls of the Hoefer patent, and the claim specifies the lever arm as a free end, moving in the arc of a circle like the lever arm *J* of the Hoefer patent. Claim 5 provides for the cam as an actuating means, and refers to the lever arm as a means controlled by said actuating means. Claim 6 differs little from claim 5. With the exception of the swaging dies, all of these claims read on the Hoefer patent.

The Wells machine was geared to operate at about 600 revolutions per minute on the fly wheel and 2,800 to 2,900 revolutions on the straightener, delivering 75 to 80 feet of cut length wire per minute. The machine was operated satisfactorily to produce plain wire, but apparently had not been used to produce swaged wire. Appellants speeded up the machine to get a greater production. The fly wheel, the straightener, the feed rolls, and the rocking lever arm which carries the dies, were co-ordinated in the original Wells machine so that there would be no material lag of the wire while the cutting die was passing across the orifice to sever the wire and back again. There was considerable difficulty in obtaining this speed and operation, and the experimental work covered a period of months, but the object was obtained, and the appellants were able to swage at the end of the wire near the point where it was severed. From the testimony, it is apparent that this experimentation was carried on largely by the superintendent of the wire department of the appellant company. He satisfactorily increased the

speed of the operation of the machine, overcame the difficulty due to weakness in the strength of the machine, which was overtaxed by this increase in the speed, and obtained the desired result.

Some of the difficulties encountered were that the increase in the speed weakened the parts of the machine; the straightener which helps force the wire through the machine, and the feed rolls, which pull the wire from the straightener and operating at a higher rate of speed than the feed rollers, was heated and to some extent crystallized the wire by frictional engagement with the wire, and also the straightener bearings got hot. The feed rolls are between the straightener and the dies and, after experiencing the troubles from speeding up the straightener, it was thought to be corrected by the appellants speeding up the feed rolls, but they did not speed up the dies. The result was still damaging, and they next increased the longitudinal play of the straightener so that it could yield backward during the lay of the wire, but this did not prevent the damaging friction of the heat. They then discovered that they could not run the wire into and from the machine faster than they could deliver it from the machine, and, with increased speed of the devices moving the wire through the machine, it was necessary to correspondingly increase the operation of the dies. This was necessary to reduce the lag of the wire during the die operation in preparation to the increased speed of the movement of the wire. There was a cam on the machine used during all this experimentation, and then the appellants discovered the necessity of changing the cam. This resulted in being able to speed up the dies. The result was a more appropriate throw on the cam, and made it possible to strike a sharper blow with the dies. It was thus found that, when the lower swaging die was located immediately below the orifice, the wire would hang or rest on the die and not throw off into the carriage where the cut lengths collected, and so they put the bottom die at an angle of approximately 45°, so as to shorten up the blow and not keep the orifice covered by the cut-off arm carrying the upper swaging die. The result is described as a "quick recovery and also a shorter blow." After these parts were co-ordinated to the desired increased speed of the operation, no more trouble was experienced. These changes were the result of mechanical ability in making necessary changes for speedier operation. Adding the swaging die to the machine resulted in increased shock or jolts to the machine; increasing the speed of the machine overtaxed its strength and necessitated the strengthening of the machine, and these weaknesses were discovered and remedied by the exercise of mechanical ability.

About the time these changes were made, there is little doubt that the appellee was interested and sought to obtain a machine which would produce the same result for them. Whatever may be said of their conduct and their method of obtaining information about which it is now unnecessary to express an opinion, we do not think it bears upon the question of the validity of the patent in suit.

The most that may be said was that there was an alteration in the shape, construction, and placement of the cam for cutting and swaging the wire. But this was the application of knowledge of a skilled mechanic, and did not rise to the dignity of inventive genius; nor did placing the die in the manner described upon the machine amount to invention. Both the cam and dies were common and well known in the construction of machines. The cam did not overcome any inherent defect in Wells machine which presents patentable qualities. The Wells machine operated successfully for the purposes for which it was used prior to the experiments of the appellants. There was some change in the shape of the cam for the eccentric which was used under the Hoefer patent. In manufacturing the machine, Wells had already substituted a cam for this eccentric, and what the appellants did was to make a little more abrupt throw. It is explained by them, "to make a little more abrupt throw on the cam so that it would hit a sharper blow." This was not creating a cam, nor was it creating a sharp blow. It was changing the operation so as to make the blow sharper. While the Hoefer patent does not show an eccentric cam, the machine made by Wells, which the appellants purchased, had cams much like that shown in the patent in suit, and differed very little from the latter cam. There is no description of the shape of the cam as illustrated in the patent, and it is changed somewhat from that found in the Wells machine. It is not that quality of inventive thought which constitutes invention. It is thus apparent that the decree below was properly entered. N. J. Zinc Co. v. American Zinc, Lead & Smelting Co. (D. C.) 276 F. 733; E. A. McMillin Co. v. Androscoggin Pulp Co. (D. C.) 291 F. 134.

Decree affirmed.